Eugene Isaiah **ROBERTS**, Plaintiff in Error,

v.

The **STATE** of Oklahoma, Defendant in Error.

No. A–15432.

Court of Criminal Appeals of Oklahoma.
July 22, 1970.

Don Anderson, Public Defender, for plaintiff in error.

G. T. Blankenship, Atty. Gen., for defendant in error.

BUSSEY, Judge:

Eugene Isaiah Roberts, hereinafter referred to as defendant, was charged in the District Court of Oklahoma County with codefendants Lloyd Anthony Arinwine and Edwin Lavern Droke, for the crime of Murder; severance was granted and defendant was separately tried by a jury who found him guilty and assessed his punishment at life imprisonment. From said judgment and sentence a timely appeal has been perfected to this Court.

Briefly stated, the facts as reflected by the record are that in the early morning hours of July 23, 1968, Willard West was found dead in the 3000 block of Northeast 9th Street, in a taxicab. The cause of death was a bullet wound at the back of the right lung and Dr. Luke, State Medical Examiner, removed the bullet, Exhibit 2, from the body.

Somewhat earlier in the evening, Henry Clay Guyton, who resided at 3037 NE 9th Street in Oklahoma City, was returning home after midnight that morning, and noticed a small blue car following behind him. He drove in his driveway and saw the other car turn in the next driveway, turn around and go west. He went inside his house and shortly thereafter heard a crash, looked out and saw that a Yellow Cab had run into the side of his car. He went out and shook the driver, who appeared to be drunk. He then went across the street to the Smith residence to use the phone and reported the cab number to the Yellow Cab Company. After the crash he again saw the same blue car approach and turn west on his street. He identified Exhibit 5 as a picture of a car of the same make and color and testified that the corner at his home was well lighted by a street light and he could see that on both occasions there was only a driver in the car, a colored male with a "bush-type head" (R 296). Guyton was taken by the police following this incident to a place where he saw the car in Exhibit 5 parked.

A. G. Smith, who lived at 3102 NE 9th Street, across the street from the Guyton's house, testified that in the early morning of July 23, 1968, around three o'clock, his wife awakened him because their dog was barking. He saw a car "like the car" pictured in Exhibit 5, parked across the street in a driveway. It remained there two or three minutes, then backed out and headed west (R 316). He saw it shortly again coming south by his house and turning west. About five minutes after it left the second time, he heard the crash of the cab into Guyton's car. He stated that the driver of the little blue car was bushyhaired, but he could not tell whether

the driver was white or colored. Later he went with police and saw the car pictured in Exhibit 5 parked somewhere near NE 36th and Kelley Streets.

Mary Lucy Smith, testified substantially as did A. G. Smith, stating that the little blue car was a Corvair; however, she was not taken to the place where the picture, Exhibit 5, was taken.

Vernon Lee Resner, a dispatcher for Yellow Cab Company was on duty that morning. He had known their driver, Willard Washington West, about eight years and was familiar with his voice over the air. The dispatcher gave West a call about 2:35 a. m. to go to 1104 NE 36th Street. The call originated from a person he could not recognize and the destination called for was 2510 B North Bryant. About 3:10 a. m. the dispatcher received a transmission from West that he had been shot, and in turn called police and directed them to 2410 N. Bryant. Shortly afterwards, acting on another call, the dispatcher directed the police to 9th and South Bryant.

Officer Jones of the Oklahoma City Police Department, was on duty at the time, and at 3:16 a. m. was dispatched to make an investigation at 2421 N. Bryant. At 3:20 a. m. he was dispatched to go to 3037 NE 9th Street. On arrival he saw a Yellow Cab collided with a parked car and in the cab was Willard Washington West. Exhibit 4 accurately represents the position of the body, except that when he arrived the car door was closed.

Officer Berglan, of the Oklahoma City Police Department, found Exhibit 1, a pistol, in the 2800 block NE 10th Street, and testified that Exhibit 8 was a true picture of the pistol where it was found. Ray Lambert, firearms examiner with the State Bureau of Investigation, testified that in his opinion, Exhibit 2, the bullet taken from the body, was fired from the pistol and that Exhibit 3, the cartridge case found in the cab, was fired in the same pistol. Officer Knox, of the Oklahoma City Police Department, testified

that he found a thumbprint in the cab on the righthand side which was the same as a known print of defendant's right thumb.

Officer Barnett, of the Oklahoma City Police Department, testified that about 2:00 a. m. on the preceding morning, July 22nd, he had occasion to stop two colored males in the vicinity of a laundromat in the 1100 block of NE 36th Street and saw a blue-green Corvair parked at a nearby service station. On the morning of July 23rd he received information from the police dispatcher about the shooting which caused him to start looking for a blue-green Corvair. He found it in the 700 block of NE 35th Street; the motor was warm and in the car he found an envelope with the name of Edwin L. Droke on it. Droke was one of the persons he had seen with the car the morning before, at the laundromat. He identified Exhibit 5 as a true picture of the car when he discovered it about 5:00 a. m. July 23rd.

Lloyd Anthony Arinwine, 19 years old, a co-defendant, who had previously pled guilty, testified that about 12:30 or 1:00 a. m. he and defendant and Edwin Lavern Droke met at defendant's apartment. After about 30 minutes they drove off in Droke's car, which he identified as being the same as the picture shown in Exhibit 5. He stated that the defendant brought up the subject of robbing a cab and they all agreed to it. They drove to Arinwine's house and he got the pistol, Exhibit 1, and gave it to defendant. They then went to 1104 NE 36th to a laundry, where he saw Droke apparently use a phone. He saw a cab arrive and defendant entered it sitting on the right and Droke entered it seating himself on the left behind the driver. By pre-arrangement, Arinwine followed the cab in Droke's car so he could pick them up after the robbery. His hair style at the time was bushy-top-two inches high (R 400). He drove to the pre-arranged place, 9th and Bryant, turned around in the driveway; then saw the cab about one and a half blocks away, so he turned around again

and parked in a side street. He soon saw the cab again on the corner of 9th; he heard a shot and saw the cab weaving and saw it hit another car, and he left. He parked the car about a half block from his house, 733 NE 35th.

Officer McMullen, of the Oklahoma City Police Department, arrested defendant about 10:00 a. m. at his house. A hearing was then held out of the jury's presence, and later in the jury's presence, and McMullen's testimony did not vary substantially either time. He stated that he warned defendant of the rights against self-incrimination both at the time of arrest and at the police station about 10:20 a. m. prior to interrogation. Defendant at first denied any knowledge or participation in the robbery, then after about an hour of interrogation and after being confronted by Droke, defendant gave a written statement, Exhibit 12. Prior to signing the statement defendant initialed certain corrections in the typing. The statement appears in the record at page 611G, the pertinent part of which is as follows:

"A. LLOYD came to my house about 10:15 PM, 7–22–68 and sat there about 10 minutes and EDWARD DROKE came up and we were sitting around just talking and LLOYD asked DROKE if he had any gas for a ride and we went around riding for a little while and then LLOYD asked DROKE did he want to buy a gun and we went over to LLOYD'S house and got the gun then went riding some more and DROKE said we ought to rob a cab driver. We went up to the laundry and called a yellow cab and told them to come up there and pick us up and LLOYD sat across the street in the car. When the cab came up, we got in the cab and then we told him that we wanted to go to 8th and N. Bryant. We went to 9th and Bryant and just before we got there, we turned and were going down ninth street and DROKE touched me and I told him I didn't want to go threw [sic] with it. I guess he got shakey, but he shot the man. I was still sitting in the car and the man turned around and looked at me and after I looked at him, DROKE started running and I got out of the cab and went around to the other side of the cab and flipped up the radio so somebody would come and then ran on down the street and I asked DROKE why did he shoot the man because I wasn't planning on shooting the man. We ran on up 10th and he put the gun behind a post in some bushes and we ran on over to my house."

Defendant testified that Arinwine and Droke came to his house on July 23rd in the early morning hours and they went riding about 1:00 a. m. in Droke's car, a blue Corvair. Soon Droke suggested that they rob a cab driver. Arinwine had a gun which they obtained, and drove to the laundry where Droke made a phone call, requesting the cab for 36th and Kelley. Defendant gave the gun to Droke and when the cab arrived he got in and sat on the right and Droke sat on the left behind the driver. As they rode off Droke told him, "Well, I'm just going for real and just rob him." Before this defendant thought Droke was joking about any robbery, but upon this statement defendant had the cab driver let him out at 23rd and Eastern because he never did want any part of robbing the man (R 520). After leaving the cab the defendant went home and the cab proceeded down Eastern with Droke. About 50 minutes later Droke came to defendant's apartment and told defendant he had tried to rob the man and had shot him. Defendant further testified that, after being advised of his rights against self-incrimination, he was questioned by Officer McMullen, during which he denied any knowledge of the shooting or robbery for about one and a half hours. He stated that he was then told that Droke (who was being interrogated separately) had told officers that defendant had fired the fatal shot and Droke was brought in confronting defendant, whereupon Droke

accused defendant of shooting the man. At pages 516 and 517 of the record, the defendant stated:

"The reason for changing my story was that if I had took the gun, they would have put me under the gun for shooting the man and I would have had a murder case instead of Droke having it, which he done it. They were going to stick me with the murder."

Defendant testified that his written statement, Exhibit 12, was not true. He said he told his interrogator part of what was in the statement, but some of the statement he never did tell them: "I told him 'no' and he wrote down 'yes'" (R 533). When asked why he did not correct this as he made the other corrections he said he never was given a chance to read the statement.

On appeal it is first argued that the evidence is insufficient to support the verdict of the jury. In this regard, we need only to repeat our holding in Disheroon v. State, Okl.Cr., 357 P.2d 236, wherein this Court, speaking through the Honorable Judge Powell, held in the first paragraph of the Syllabus:

"In the trial of a criminal case, questions of fact involving the guilt or innocence of the accused are always for the jury, and when, on appeal, the record discloses facts which would have been sufficient either to warrant a verdict of acquittal or to support a verdict of guilty, the finding of the jury will not be disturbed. In such cases only errors of law will be reviewed."

Finding this assignment of error without merit, we shall next consider defendant's contention that his statement was obtained by coercion in that defendant was without counsel and was induced to change his denial because of hearsay accusations from the interrogator that Droke had blamed defendant.

From the record it is clear that the defendant did not request a lawyer, in fact, the defendant himself made no such claim. It is also clear that the defendant was thoroughly advised of his constitutional rights against self-incrimination; that he was personally confronted by Droke before he freely and voluntarily changed his story, thus there were no hearsay accusations. It is further noted that defendant cites no authority to support this contention. It has long been the rule of this Court that it is necessary for defendant not only to assert error, but to support his contentions by both argument and the citation of authorities. Where this is not done, and it is apparent that the defendant has been deprived of no fundamental rights, the Court of Criminal Appeals will not search the books for authorities to support the mere assertion that the trial court has erred. See Moore v. State, Okl.Cr., 424 P.2d 431. We are therefore of the opinion that this assignment of error is also without merit.

It is lastly contended that the punishment imposed was excessive. In LaRue v. State, Okl.Cr., 404 P.2d 73, we held in Syllabus No. 3:

"The question of excessiveness of punishment must be determined by a study of all the facts and circumstances in each particular case, and the Court of Criminal Appeals does not have the power to modify a sentence unless we can conscientiously say that under all facts and circumstances the sentence is so excessive as to shock the conscience of the court."

In the instant case the punishment imposed could only have been life or death, and the jury imposed a life sentence. Under these circumstances we are of the opinion that the punishment imposed was not excessive.

Under the authority above set forth, we are of the opinion that the judgment and sentence appealed from should be, and the same is hereby, affirmed.

BRETT, P. J., and NIX, J., concur.