**Solomon D. WALLACE, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–16537.**

Court of Criminal Appeals of Oklahoma.

Dec. 16, 1971.

Curtis A. Parks, Public Defender, Tulsa County, for plaintiff in error.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Ass't. Atty. Gen., Frank Muret, Legal Intern, for defendant in error.

BUSSEY, Presiding Judge:

Solomon D. Wallace, hereinafter referred to as defendant, was charged in the District Court of Tulsa County, Oklahoma with the offense of Murder. He was found guilty of Manslaughter in the First Degree; his punishment was fixed at a term of not less than thirty (30), nor more than ninety (90) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Officer Harmon testified that at approximately 1:20 p. m., on March 18, 1970, he was dispatched to the 1200 block of North Kenosha Street in the city of Tulsa to investigate a man lying in a yard bleeding. He observed a Negro male lying on his back with a lot of blood in the snow in the yard of 1230 North Kenosha. He further observed blood stains in the street, and a trail of blood, accompanied with heel drag marks, from the street to where the deceased was found. He preserved the scene until the arrival of the detectives.

Detective Jones testified that he arrived at the scene at approximately 1:26 a. m., and observed the deceased, Eddy Franklin Carter, lying in the yard, with two stab wounds in his chest. In further investigating the scene, he observed blood spots and "heel drag marks," which indicated that the deceased had been moved from the street to the yard. He was subsequently re-called and testified that there was no weapon found on the person of Carter, nor at the crime scene.

Rosalee Jordan testified that on the evening in question, she and the deceased were friends, and the deceased was living at her apartment. About 10:00 p. m., she sent the deceased to her sister's house, Opal Irving, to borrow $2.00. She testified that the next time she saw the deceased, he was in the morgue at Jackson's Funeral Parlor.

Opal Irving testified that on the evening in question, Eddy Carter came to her home at approximately midnight. He wanted to borrow $2.00, and upon being refused, stated that he had had an argument with his girl friend, and wanted to spend the night in her house. She refused, and Carter began cursing her. Defendant, who had been in the back room with her daughter, Betty Bruner, came into the living room and asked her if there was anything he could do to help. She replied that she could handle it herself. Carter continued to curse both her and the defendant, but was not violent. As Carter was leaving, he made the comment to the defendant that "he had something for all of them young punks." (Tr. 47) The defendant attempted to follow Carter through the front door, but was stopped by Mrs. Irving. Approximately three minutes later, the defendant exited through the back door, over the objection of Mrs. Irving. Her daughter, Betty Bruner, came from the bedroom and left through the front door. Approximately ten minutes later, Betty Bruner and the defendant returned through the front door together. The defendant had blood on his hand, and stated, "I knocked him out." (Tr. 55)

Betty Bruner and the defendant then left the house and subsequently returned. Upon their return, Betty stated to her mother, Mrs. Irving, "Mama, this man . . . Eddy Carter, has been stabbed." (Tr. 57)

The court conducted an Evidentiary Hearing outside the presence of the jury to determine the marital status of Betty Joyce Bruner and the defendant. The trial court, after having the testimony of Betty Bruner, ruled that there was no valid commonlaw marriage. The jury was returned to the courtroom, and the witness testified

that on the evening in question, she was at her mother's house, as was the defendant, at the time the deceased arrived. She testified that the deceased and her mother had a conversation concerning Carter's borrowing $2.00; Carter began to curse her mother, and the defendant went into the living room and asked Carter to leave. As Carter left, he stated to the defendant, "He had something for little punks like him." Defendant started to follow Carter out the front door, and was stopped by her mother. Carter remained on the front porch, cursing for a short time, and then left. Defendant left through the back door, and she (Betty) went through the front door. She stood on the front porch of the house and observed the defendant and the deceased enter into a conversation in the street. Carter continued to curse the defendant, and struck him with his fist. They started fighting, and she observed Carter fall to the ground. Her mother hollered from the house to the defendant not to cut Carter; she did not see any weapons on either person. She testified that she had known the defendant for approximately eighteen months, and knew that he carried a knife. They returned to her mother's house, and the defendant's left hand was bleeding. The defendant first told her mother that he had knocked Carter out, and later stated that he had cut him. The defendant told her to call an ambulance. The defendant left as the police were arriving, because "he didn't want to get in trouble."

Willie Mae Mainer testified that she was in the home of Opal Irving on the evening in question, and that some time after Eddy Carter left, the defendant acted very disturbed, and stated that he had "cut this guy." She and the defendant went outside, and the defendant led her to the location where Carter was lying. She stated, "He's dying," and the defendant asked her to feel him. Defendant stated that he had dragged him there.

Doctor Lowbeer testified that he performed an autopsy on the body of Eddy Carter, and that in his opinion, the cause of death was a perforation of the heart by a sharp instrument, which had a blade with a minimal length of two inches. He observed two stab wounds, one of which was the cause of death. He testified that in his opinion, the wounds were compatible with a person who was left-handed. On cross examination, he testified that the history of the case reflected that Carter had been a convict known to the police.

For the defense, the defendant made an offer of proof as to the deceased's character through an attempt to call the court clerk to testify that Carter was convicted of Possession of Marijuana in 1968, and received a three-year sentence. This offer of proof was denied by the trial court. The defendant next recalled Rosalee Jordan and asked additional questions as to the character of the deceased. The witness stated that she was not aware of his having any prior criminal conviction. Defendant made a further offer of proof that Ella Wallace, the sister of the defendant, would testify that the defendant's occupation was as a narcotics seller. This offer was denied.

Ella Wallace was then called as a witness, and testified that the defendant had a knife with a blade one inch long.

█ The first proposition asserts that the trial court erred in overruling the motion to suppress any testimony by the witness, Betty Joyce Bruner, on the grounds that said witness was the commonlaw wife of the defendant. At the Evidentiary Hearing, Betty Joyce Bruner testified that she commenced living with the defendant in September, 1969, when she was sixteen years old. She testified that she lived with the defendant until he was arrested in May of 1970. She testified that "we was supposed to be husband and wife," and that they were supposed to get married in June of 1970, but were prevented from doing so by his arrest. She testified that at times she used his name, but was in the habit of writing her name as Betty Joyce Bruner, and, "I just kept that habit up." (Tr. 90)

on re-cross examination, she testified as follows:

"Q. Okay. In other words, you wanted a license to legally prove you were married—

"A. Yes.

"Q. —in June?

"A. Yes.

"Q. Of this year?

"A. Of '70.

"Q. And by that, I assume you didn't assume yourselves legally married before June?

"MR. GASKILL: Now, we will object to that, Your Honor.

"THE COURT: Overruled.

"A. Yes.

"Q. (By Mr. Thompson) You didn't consider yourselves legally married?

"A. Yes, but—

"Q. Just answer my question yes or no.

"A. Yes."

(Tr. 92–93)

In dealing with the exact question in the case of McKee v. State, Okl.Cr., 452 P.2d 169, wherein, as in the instant case, the underage alleged commonlaw wife was the only person who testified as to the marriage relationship, the Court stated:

"As we see the proposition in this case, if the agreement of both parties had been fully understood between them—that they were married—that notwithstanding the age of the prosecutrix the marriage would have been merely voidable. But, when the full context of the testimony is considered it appears that defendant had certain reservations concerning whether or not he could marry the prosecutrix (legally or at common-law), because of the uncertain status of his previous divorce. Insofar as the prosecutrix was the only witness produced, and whose testimony defendant stood upon to prove the existence of common-law marriage, we are bound to accept her testimony on the subject."

We further stated in *McKee,* supra:

"We are therefore of the opinion that the trial judge did not commit error when he overruled defendant's objection to the testimony of the prosecutrix; and consequently in answer to the initial issue presented, on the basis of the record before the Court, the prosecutrix was legally competent to testify against defendant. From the testimony offered by the State, the showing is that defendant did not act and speak in a sufficiently positive manner to evidence his present intent to accomplish a common-law marriage."

In the instant case, we observe that Betty Joyce Bruner did not consider herself legally married, that there was no showing that the voidable commonlaw marriage had ripened into legitimate relations by the removal of the legal impediments, and further, that the defendant, as in *McKee,* supra, did not act and speak in a sufficiently positive manner to evidence his present intent to accomplish a commonlaw marriage. We, therefore find this proposition to be without merit.

 Defendant argues that the State put the deceased's character in issue by asking the following questions:

"Q. Mrs. Jordan, you stated that you knew Mr. Carter for some 25 years.

"A. Yes.

"Q. Do you know what he did for a living?

"A. When I knew him on the coast, he was doing field work, working in the harvest.

"Q. Do you know what he did here in town, please?

"A. Well, he shined shoes out on 11th Street.

"Q. All right. Do you know what barber shop he shined shoes in?

"A. I don't know, but I think that was —he shined shoes for him. I can't just recall the barber shop.

"Q. All right. What type of person was Mr. Carter to you?

"MR. GASKILL: Now, we will object to that, Your Honor.

"THE COURT: She may answer the question as to their relationship.

"Q. (By Mr. Heslet) Was he a happy person or a sad person?

"A. Yes, he was. He was a very nice person.

We observe that the witness's answer, "Yes, he was. He was a very nice person," is not responsive to the stated question. We are of the opinion that the State was not attempting to put the deceased's character in issue. We further observe that the deceased's prior conviction for Possession of Marijuana and his reputation by the offer of proof by the defendant's sister that he was a narcotics seller was not relevant to the prosecution for a homicide. In Thompson v. State, Okl.Cr., 365 P.2d 834, we stated:

"If there is no evidence in the record that the defendant acted in necessary self defense in taking the life of another then it is immaterial that the deceased was a drunkard, a man of violence, or that he was of poor moral character. It is no less murder to take the life of a thief without just cause or excuse than to take the life of a law abiding person."

■ The final proposition asserts that the punishment is excessive. We have repeatedly held that the question of excessiveness of punishment must be determined by a study of all the facts and circumstances in each particular case, and the Court of Criminal Appeals does not have the power to modify a sentence unless we can conscientiously say that under all the facts and circumstances the sentence is so excessive as to shock the conscience of the Court. Roberts v. State, Okl.Cr., 473 P.2d 264. From the foregoing statement of facts, we cannot conscientiously say that the sentence imposed shocks the conscience of this Court. The judgment and sentence is, accordingly, affirmed.

BRETT, J., concurs.