Antoine (Tony) LEROY, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–17005.

Court of Criminal Appeals of Oklahoma.

Nov. 8, 1972.

Max M. Berry, Special Public Defender, Kay County, for appellant.

Larry Derryberry, Atty. Gen., Charles L. Pain, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, Antoine (Tony) Leroy, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Kay County, Oklahoma, for the offense of Murder; his punishment was fixed at life imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

The Information charged the defendant and one Meredith Decorah with aiding, abetting and encouraging the Co-defendant Edward Levi Leroy to stab to death one Mark Buffalohead on November 26, 1970. The case against Co-defendant Decorah was dismissed after the preliminary hearing. Co-defendant Edward Levi Leroy entered a plea of guilty to the charge and was sentenced to a term of life imprisonment in the state penitentiary.

At the trial, Timothy Buffalohead, age 31, testified that on the evening of November 25, 1970 he picked up his two brothers, Ronnie, age fifteen, and Mark, age sixteen, to go rabbit hunting. At approximately 8:00 p. m., they went into Ponca City to purchase some pop, potato chips and beer. They had car trouble and met his cousin, Freddie Others, who agreed to meet them later at the rock crusher and help fix the car. They picked up a friend of Mark's, George Karty, and proceeded to the rock crusher area. Freddie Others and some friends arrived shortly thereafter and they drank beer and worked on the car. During this period of time, the defendant and his brother, Edward, came to the scene and stayed approximately twenty minutes. At approximately midnight, they were not able to repair the car and decided to sleep in the car and try to fix it at daylight. He woke up about two and one-half hours later as he was being dragged out of the car by the defendant. He next felt a sharp pain in his chest. He attempted to fight back and fell to the ground. Just before he lost consciousness, he heard the defendant state "kill him, kill him." The next thing he remembered was being dragged away from the car by George Karty. They walked for approximately three-quarters of a mile and were picked up by Freddie Others. They went back to the scene and attempted to find his two brothers, without success. He was then taken to the hospital where he was treated for a stab wound in the back.

Vern Orndorff and Undersheriff Danny Johnstone identified photographs of the scene and at the location where the deceased's body was found.

George Karty testified that he went riding with the Buffalohead brothers on the night in question. They had car trouble and decided to go to the rock crusher and try to fix it. Freddie Others and some of his friends arrived at the area and Freddie helped Timmy work on the car. At approximately 10:00 p. m., the defendant, his brother Edward and Meredith Decorah arrived at the area in a pickup. They stayed for fifteen minutes and he observed that the defendant had a knife in his hand which appeared to be a switchblade with a five or six inch blade. When the car would not start, they decided to sleep in the car. Some time later, he work up and observed Edward Leroy in the back seat with his arm around Timmy Buffalohead's neck. The defendant was on the outside of the car trying to pull Timmy from the car. As the defendant was dragging Timmy out of the car, Edward Leroy stabbed him. Timmy ran and both the defendant

and Edward chased him for a short distance. They both returned to the car and when Mark Buffalohead got out of the car, the defendant said, "stab him, stab him." Edward Leroy then stabbed Mark Buffalohead in the chest. Mark hit the defendant with his fist and ran in a northeast direction away from the car, chased by the defendant and Edward Leroy. He and Ronnie Buffalohead then escaped from the car and ran in opposite directions. Approximately fifty yards from the car, he observed Timmy lying on the ground bleeding. He picked up Timmy and helped him down the road until they were picked up by Freddie Others. He testified that he discovered his billfold was missing and did not see it again until the preliminary hearing.

Marilyn Stansblack, the defendant's sister, testified that Edward Leroy came to her home at about 2:30 in the morning on November 26. She observed the defendant, his wife, Elvira, and Meredith in the pickup. In her opinion, all of them were drunk. The defendant and Edward returned at approximately 7:20 a. m. and wanted money to buy gas. The defendant stated, "I think I killed Timmy.'" (Tr. 337) Defendant showed her a bloody pocket knife and asked her if she wanted it. She replied, "no" and the defendant folded it up and put it back in his pocket. She gave them a dollar and they left in the pickup.

Sheriff Coffelt testified concerning the investigation of the scene and the finding of the body of Mark Buffalohead. He subsequently went to Pender, Nebraska and took custody of the defendant and Edward Leroy. He identified the billfold of George Karty, which was given to him by the Sheriff in Pender, Nebraska as part of the defendant's personal belongings.

Roy Buffalohead, father of the deceased, testified that he identified the body of his son, Mark.

Dr. George Moore, the County Medical Examiner, testified concerning his investigation of the death scene. He observed a puncture wound over the heart of Mark Buffalohead.

Dr. Steven Parks testified that he performed an autopsy on the body of Mark Buffalohead and, in his opinion, the cause of death was a stab wound which penetrated the heart causing massive hemorrhage into the left chest and left precardial sac.

For the defense, Deputy Johnstone was recalled and identified color slides which he took of the Buffalohead car on November 27, 1970. On cross-examination, he identified other color slides taken at the same time showing the body and the area where the body was found.

Norman Blueback testified that he went to the rock crusher area on the night in question with Freddie Others. The defendant, his wife, Edward, and Meredith Decorah came to the location and visited for approximately ten minutes. After finishing the beer, he left in Freddie's car. They returned to the area approximately thirty minutes later and observed George Karty carrying Timmy Buffalohead, who was bleeding. They returned to the rock crusher area and searched for Mark.

Ronnie Buffalohead testified that while he was at the rock crusher area with his brothers, the defendant arrived in a pickup with his wife, Elvira, Edward, and Meredith Decorah. He heard the defendant state, " 'I'm going to get somebody.' " Defendant pulled out a knife and said, " 'I'm going to get some of your people.' " He then stated, " 'I'm going to get one of you, but I hope it's not your people.' " (Tr. 426–427) After they all went to sleep, he was awakened by someone trying to get into the vehicle. He observed a green pickup parked behind their car. Both the defendant and Edward got into the back seat. Defendant put a knife to his (Ronnie's) throat and asked him if he had any money. Defendant then grabbed Timmy around the neck and still had the knife in his hand. Timmy was pulled from the car and he (Ronnie) ran.

Elvira Leroy, the defendant's wife, testified that she, the defendant, Edward, and

Meredith Decorah went to the rock crusher area at approximately 10:30 p. m. They remained approximately twenty minutes and left. They returned to the area approximately two hours later and stopped behind a white car. The three men got out of the car and stayed approximately 3 or 4 minutes. She did not see anyone in the parked car nor did she see any fighting or stabbing.

The defendant testified that he was married and had a daughter three years old. He had previously been convicted of Burglary, Grand Larceny, Assault With a Deadly Weapon, Carrying a Weapon After Former Conviction, and Interstate Transportation of a Stolen Vehicle. On the evening in question, he, his wife, Edward, and Meredith were riding around and drinking. He talked to Freddie Others who invited him out to the rock crusher. They arrived at the area just before midnight and visited with the persons there. He traded his switchblade knife to Freddie Others for a can of beer. They stayed about fifteen minutes and returned to town. In approximately two hours they returned to the area. He and his wife had been arguing so Edward and Meredith got out of the car saying, "Why don't you take her home." He started to leave when he heard some loud cussing and hollering down the road. He drove down the road a short distance and observed someone fighting. When he stopped the pickup, everyone started running and Leroy and Meredith came back to the car. He told his wife that he was going to take the knife away from Edward and she replied, "no, he'll stab you with it." (Tr. 494) He got out of the pickup and Freddie Others helped him take the knife away from Edward. He got Edward and Meredith back into the pickup and they left. Edward stated that he had "stabbed old Timmy." They returned to the area at approximately 4:00 to look for some beer in the car. While they were there, George Karty came walking up and told them that Timmy was stabbed and was in the hospital. He and Meredith started teasing Karty and asked him if he had any money. Karty got scared, threw his billfold down and ran. Freddie Others drove up in a car and he asked Freddie where everyone was. Freddie replied that they had taken Timmy to the hospital and handed him the knife. They returned to town, rode around a while and went to Al Schambron's to get some gas. Schambron asked them if they had heard about the fight at the rock crusher. They went back to the rock crusher and "there was some cars up there and they made us turn around and leave." (Tr. 510) He and his wife continued to argue and he decided that he would get his clothes and leave. They took Elvira home, he packed his stuff and put it in the pickup. Edward and Meredith talked him into going with them to Omaha. They stopped by the house of his sister, Marilyn Stansblack, borrowed some money and drove to Nebraska. On the way to Nebraska, he noticed George Karty's billfold lying on the floor inside the pickup. He picked it up and put it in his pocket.

In rebuttal, Elvira Leroy was recalled and testified that they went to the rock crusher on only two occasions on the night and early morning in question. She testified that she did not remember telling the defendant not to get out and take the knife away from Edward.

Al Schambron testified that he operated a service station and package store south of Ponca City. At about 7:00 a. m. on Thanksgiving Day, the defendant, Edward, and Decorah came by the station and purchased some gas. He denied having a conversation with the defendant concerning the fight at the rock crusher.

Freddie Others denied obtaining a knife from the defendant that evening. He testified that he did not see the defendant at any time after they left the rock crusher the first time.

█ The first proposition asserts that the court erred in overruling defendant's objection to the State's question of the defendant concerning a prior conviction in

Wichita, Kansas. The alleged improper question was as follows:

"Q: Were you also convicted in Wichita, Kansas, in 1966, of disturbing the peace by fighting?" (Tr. 518)

Defendant objected to the question on the grounds that it was not a felony crime. The objection was overruled and the defendant denied the conviction. Defendant argues that the State did not thereafter offer to prove that the defendant had been, in fact, guilty of this crime in Wichita, thus prejudicing him in the eyes of the jury. We need only observe that the defendant on direct examination admitted convictions of Burglary, Grand Larceny, Assault With a Deadly Weapon, Carrying a Weapon After Former Conviction, and Transportation of a Stolen Vehicle. It would thus appear to be highly unlikely that the question concerning a conviction of Disturbing the Peace By Fighting would have prejudiced the defendant in any light.

■ The second proposition contends that the Court erred when it received into evidence pictures of a body as the body of the victim before the body, as shown in the pictures, was properly identified. We note that this proposition recites no citations of authority for the position urged. We have repeatedly held that it is necessary for the defendant not only to assert error but support contentions by both argument and citation of authority; where this has not been done and it is apparent that the defendant has been denied no fundamental rights, the reviewing Court will not search the books for authorities to support the mere assertion of error. Roberts v. State, Okl.Cr., 473 P.2d 264. Although this proposition is improperly before this Court, we observe that prior to the testimony of Vern Orndorff, Timmy Buffalohead had identified a photo of the deceased's body as that of his brother, Mark Buffalohead. (Tr. 228)

■ The third proposition asserts that the prosecuting attorney made an improper statement in his closing argument referring to the weapon used. The record reflects that the prosecuting attorney stated, "he had that butcher knife—that hog-killing, cow-killing weapon that you would use." (Tr. 669–670) We are of the opinion that the remark was improper; however, we do not deem the same to constitute reversible error in view of the overwhelming evidence of defendant's guilt. In Battle v. State, Okl.Cr., 478 P.2d 1005, we stated in the first paragraph of the syllabus:

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration and argumentation is wide. Counsel for both the State and the defendant have a right to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom. It is only when argument by counsel of the State is *grossly* improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument." (Emphasis added.)

■ The fourth proposition contends that the court erred in overruling defendant's objections of colored slides of the deceased when black and white photographs of the same had been admitted into evidence previously and were shown with the intent of arousing passion and sympathy on the part of the jury. We have carefully examined the slides and are of the opinion that the same are not gruesome such as to arouse the passion of the jury. In three of the slides, the body is only incidentally or barely visible at the feet of the men standing around it. The other three slides show the upper half of the fully clothed body. We, therefore, find this proposition to be without merit.

The fifth proposition asserts that the court erred in hearing a guilty plea in another case during a recess in presence of the jury. Defendant again does not support this proposition by the citation of authority. For the reasons set forth in Roberts v. State, *supra*, we therefore find this proposition to be without merit.

**254**

The final proposition contends that the sentence is excessive. We have consistently held that the question of excessiveness of punishment must be deetrmincd by a study of all facts and circumstances in each case, and the Court of Criminal Appeals does not have the power to modify a sentence unless we can conscientiously say that under all the facts and circumstances, the sentence is so excessive as to shock the conscience of the Court. We are of the opinion that the sentence imposed was richly deserved by the defendant. The evidence of defendant's guilt in aiding and abetting his brother in taking the life of an innocent fifteen-year-old boy is overwhelming. The defendant's testimony of what occurred is not supported by even his own witnesses.

The judgment and sentence is affirmed.

BRETT, J., concurs.