George Edward FRED, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–74–263.

Court of Criminal Appeals of Oklahoma.

Jan. 3, 1975.

Rehearing Denied Feb. 18, 1975.

Park, Nelson & Caywood by Kerry W. Caywood, Chickasha, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., David K. McCurdy, Legal Intern, for appellee.

OPINION

BUSSEY, Judge:

In the District Court, Grady County, Case No. CRF-73-16, appellant, George Edward Fred, hereinafter referred to as defendant, was charged and tried for the offense of Murder. He was convicted by a jury for the lesser included offense of Manslaughter in the First Degree, in violation of 21 O.S.1971, § 711. His punishment was fixed at thirty-five (35) years imprisonment, and from said judgment and sentence he has perfected a timely appeal to this Court.

At trial, James L. Lewis testified to the following facts. He rented a sleeping room at 1209 Colorado, Chickasha, Oklahoma, from the deceased, Mrs. Edna Shaw, and had boarded there for a period of two or three weeks until the disappearance and death of Mrs. Shaw on February 2, 1973. On February 2nd, he had returned home from work around 6:30 or 7:00 p. m. and ate dinner with Edna Shaw between 7:30 and 8:00 p. m. He left the apartment around 8:15 or 8:30 to go visit a friend, Kathryn Defur. The front door of the apartment did not lock from the inside and he had padlocked the door from the outside and had taken the key with him in order not to awaken Mrs. Shaw when he returned. He returned to the residence around 10:30 p. m., unlocked the padlock and upon entering, noticed that the television and Mrs. Shaw were gone. The television normally sat beside the front door of the apartment. Lewis paid no attention to the fact that the TV and Mrs. Shaw were gone, and went to bed. He was awakened around 5:00 the next morning by the phone ringing. He answered the phone and the call was for Mrs. Shaw, and he stated that Mrs. Shaw was not there. He then went to the kitchen and made himself a cup of coffee and noticed something unusual on the floor in the kitchen, but thought it was mud. Approximately 15 minutes later Mrs. Shaw's employer called and Lewis told the employer that Mrs. Shaw was not there, hung up the phone,

and returned to the kitchen and made another cup of coffee. When he went to the ice box to get lunch meat in order to make himself a sandwich, he discovered Mrs. Shaw's eyeglasses laying upside down in front of the ice box. Because it was dark in the kitchen, he used his cigarette lighter to look closer and discovered what he had thought to be mud was in fact blood. The blood was all over the floor and covered some paper sack and "stuff" in the corner. He then called Mrs. Shaw's employer to get the phone number of Mrs. Shaw's sister, whom he next called concerning the whereabouts of Edna Shaw. The sister informed Lewis that Edna was not there, so Lewis decided he should call the police, which he did.

Lewis testified that Edna Shaw was a tall, rather big-boned, heavy-set woman with gray hair and was approximately 65 years of age. He stated that she had a distinctive gap between her two top front teeth. He further testified that Edna Shaw's television was a large, brown console type color set (24 inch screen) with eight inch legs. It was his further testimony that defendant, George Edward Fred, had rented the apartment next to Mrs. Shaw, but that he had moved out one week or ten days before February 2, 1973, and that defendant had, on one occasion, eaten dinner with Lewis and Edna Shaw.

Kathryn Defur testified that on the night in question, February 2, 1973, that James L. Lewis came to her home around 8:00 p.m. and stayed until 10:15 p.m.

May Fine, sister of deceased Edna Shaw, testified that Edna was approximately five feet, six and one-half inches or five feet, seven inches tall, and weighed approximately 135 to 140 pounds, and had gray hair; that Edna suffered arthritic pain in her neck, knees, shoulders and legs, and that she had once suffered a broken shoulder. She further stated that Edna Shaw had a wide space between her two top front teeth.

On the night in question, May Fine talked to her sister Edna on the phone sev-

eral times and the last contact she had was around 9:20 p.m. when Edna called her and told her, in a low whispering voice, to call her back in five minutes. During this conversation she had heard Edna's television in the background. May Fine failed to return the call to Edna, but related the conversation she had had with James Lewis when Mr. Lewis called concerning Edna's whereabouts.

Georgene Carmen Walker testified that on February 2, 1973, she resided at 1209 Colorado in Chickasha, Oklahoma, in an apartment directly above Edna Shaw, and on that night, at approximately 9:00 p.m., she heard a man's voice and Edna's voice, talking loudly and Edna was using obscene language. Approximately 10 or 15 minutes later, she heard doors slamming downstairs, then something heavy being dragged, and a car motor running beneath the bedroom window, which is by Mrs. Shaw's living room.

Thomas Dillard Walker, husband of witness Georgene Carmen Walker, testified that on the night in question the only sounds he heard were the slamming of the door and something like the moving of furniture; however, on cross-examination he stated that he had a hearing problem.

Louise Jones testified that on February 2, 1973, she was working at the Green Parrot Tavern in Chickasha, and after identifying the defendant as George Edward Fred, she stated that the defendant was by himself in the tavern from around 6:30 or 7:00 p.m. until approximately 9:00 p.m.

Rod Rinn's testimony was that on February 2, 1973, he lived at 1727 Tennessee in Chickasha, and the defendant was his friend. On the night in question the defendant came over to his house between 9:00 and 10:00 p.m., borrowed $5.00, and asked Rinn to help him move a TV from the front seat of his car to the back seat. Rinn stated that defendant told him he had stolen the television; however, he helped defendant move the TV in defendant's car (a 1965 or 1966 white Dodge or Plymouth), and that the TV was a big, brown console television with the legs screwed off. Defendant borrowed a .22 caliber pistol from him, which defendant loaded and stuck in his pocket, or belt, and left. There was no one with defendant when he came to Rinn's house, and no one was with him when he left.

Melvin Ashley testified that he resided at 1021 SW 52nd, Oklahoma City, Oklahoma, and he and defendant were friends. On February 2, 1973, defendant came to his house between 9:30 and 10:30 p.m. and said that he had a TV for sale, which he had obtained from a Negro male who owed him some money. Defendant told Ashley that the Negro male had gotten the TV from some people who had beaten an old man. Defendant sold the TV to Bob Thompson who was at Ashley's house that evening. The next time Ashley saw the defendant was on February 9, 1973, at which time the defendant told him that an old lady had been beaten to get the TV instead of an old man, and that they had found blood all over the floor at the place where it had happened. On February 11th, defendant took Ashley to work at which time he noticed the turtle back and observed the trunk mat was missing. When he asked defendant about the missing mat, defendant replied that he had cleaned it out and thrown it away.

Bob D. Thompson testified that he resided at 801 SW 48th, Oklahoma City, and on the night of February 2, 1973, he purchased a TV from defendant for $10.00. The TV was located in the back seat of defendant's car and he and defendant left Melvin Ashley's home and took the TV to Thompson's house. The TV stayed at his house until James Turner and Earnest Lovett, agents from the Oklahoma State Bureau of Investigation, picked it up. When the agents arrived, Thompson put his initials on the back of the set.

Kenneth Lee Hurst testified that he resided at 1123 S. 15th, Chickasha, Oklahoma, and he and defendant were "pretty good friends." On the morning of February 3, 1973, defendant came to his house, driving his car (a 1966 or 1967 Plymouth

or Dodge), which appeared to be unusually clean. Hurst stated that defendant had said he had not slept the night before. On February 5th, defendant had ridden to Oklahoma City with Hurst and Gary Henry, and on this trip there was conversation with regard to the disappearance of Mrs. Shaw. Hurst jokingly asked defendant where he hid the body and defendant did not respond.

Don Hall, a Baptist Minister in Chickasha, testified that he knew the defendant, having met him on February 5th while on church visitation of a new-comers list from the Public Service, during which time defendant said Mrs. Shaw was missing—that the Lord had taken her.

Ernest Moore, a television appliance dealer in Chickasha, testified that he had sold an Admiral color television set to Mrs. Edna Shaw; Model No. LN5331, Serial No. 14626198 (State's Exhibit No. 60). He identified the Exhibit as the same set he sold Mrs. Shaw, and stated that in February of 1973, the value of Mrs. Shaw's set would be approximately $100 to $200.-00.

At this juncture in the trial, the counsel stipulated that if Dr. Clyde Snow, an expert in physical anthropology, were called and sworn as a witness on behalf of the State of Oklahoma, he would testify that on February 14, 1973, he visited a wooded scene approximately 38.8 miles north of Chickasha, located in the southwest corner of Canadian County; that he was directed to this location where he observed the partial remains of a human body, and that he examined these remains at the scene and also after the remains were removed to the State Medical Examiner's Office in Oklahoma City. From examination and observation, and his training and experience, he estimated this person to be a Caucasoid female between 55 and 70 years, close to five feet, six inches tall, prior to death. His findings were a moderate to severe condition of osteoarthritis; the front teeth were intact but the back teeth were out, and there was a gap between the front teeth.

Following an in camera Jackson-Denno type hearing regarding the admissibility of certain evidence, the State called Danny Wheeler, a detective for the Chickasha Police Department, who had investigated the disappearance of Mrs. Shaw and the disappearance of the color TV from her residence. Wheeler testified that he was summoned to the Shaw residence at 6:40 a.m. on February 3, 1973. When he arrived at the Shaw apartment, it was generally unruly in the house, with books and other objects laying on the floor. As he went into the kitchen the dishes were still on the kitchen table from a meal. There was a large blood spot on the floor and next to this blood spot there was a pair of eyeglasses laying between the blood spot and the refrigerator. Blood was also on the bottom of the back door and on some steps outside the residence. He further testified that the building at 1209 Colorado is a two-story, wood-framed apartment house with two apartments downstairs and one apartment upstairs, and Mrs. Shaw's apartment was the south apartment on the ground level. There was no sign of forcible entry into the apartment. He identified a number of exhibits found at Mrs. Shaw's apartment.

Detective Wheeler then testified that he first came into contact with defendant at approximately 11:30 a.m. on February 12, 1973, at defendant's place of employment. He advised defendant of his Miranda rights, and at that time defendant appeared calm and went with the officers to Alexander's Cafe in Chickasha, where they ate. After eating, the defendant read and signed a Consent to Search form of his house and car. They went to defendant's house at 1602½ S. 17th Street in Chickasha, where he discovered, in the bedroom, a white shirt, an orange shirt, and a pair of tan shoes which had blood stains on them. Agent Lovett, Sheriff Lee Looper, Detective Bob Snell and defendant then went to the defendant's car where a tube of muffler cement, which had blood stains on it, was seized. Detective Wheeler identified, by his initials on the lapel, a jacket

which was found on February 14th in the creek bed of Boggy Creek, northwest of Minco, Oklahoma. He also identified a photograph of the jacket laying in the creek bed of Boggy Creek.

Frank Brady, an agent for the Oklahoma State Bureau of Investigation, testified that the first time he saw the defendant was on February 12, 1973, at the Bureau headquarters in Oklahoma City, where he advised defendant of his Miranda rights prior to his conversation with defendant, and that defendant appeared to be normal, cooperative and talkative. Brady then inquired of defendant as to his activities on February 2, 1973, and defendant told them that between 7:00 and 7:30 p.m. on that day, he went to the Green Parrot Lounge in Chickasha, shot pool until approximately 9:00 or 9:30, at which time he purchased a six pack of beer and went to his residence. While he was watching television he fell asleep and awoke at approximately 1:30 a.m. When asked if he had been to Rod Rinn's house in Chickasha and gotten assistance in moving a TV set from the front of his car to the back seat of his car, and also if he had borrowed $5.00 from Rinn at approximately 9:30 p. m. on February 2, 1973, defendant hesitated for a short period of time and then blurted out, as he hit the table in front of him, "I killed her . . . " Later he added that he really did not kill her, but he was responsible for her death.

Earnest Lovett, an agent for the O.S.B. I. and was the investigating officer in this case, stated that his first contact with defendant was on February 12, 1973, at 11:30 a.m. at defendant's place of employment in Chickasha. The defendant was escorted by Sheriff Looper and Detective Snell to Lovett's vehicle and Lovett introduced himself and Detective Snell, at which time he told defendant that the officers were there to investigate the disappearance and possible murder of Edna Shaw and wanted to talk with him regarding any knowledge he might have. Before discussing the case, Lovett advised defendant of his Miranda rights and filled out a Miranda warning

card which defendant read and signed. At that time defendant appeared calm and relaxed, and answered the questions directly, clearly and intelligently. Defendant discussed his activities on February 2nd, telling Lovett essentially the same story he had told Agent Brady. He said that he had knowledge of what happened to Mrs. Shaw, that he wanted to cooperate with the officers, the investigation, and prove his innocence; also, he wished to assist the officers in attempting to find out if Mrs. Shaw had been murdered, and if so, who had murdered her. They were at defendant's place of employment for approximately 35 to 40 minutes and then Detective Snell, Detective Wheeler, the defendant and Lovett went to Alexander's Cafe for lunch. After lunch they again advised defendant of his constitutional rights and read the defendant the waiver of consent to search his apartment and automobile, which defendant said he understood and signed. They then went to the police department where they got an ink-rolled print from defendant to compare with latent prints which may have been found in the victim's home. They then proceeded to defendant's apartment where defendant unlocked the door and admitted the officers. Lovett testified as to the items found in the apartment and car, and further stated that a piece of trunk mat was found and that the trunk appeared to have been washed out hurriedly and was clean. Lovett then proceeded to Oklahoma City to the O.S.B.I. Headquarters where defendant was again advised of his rights. Defendant appeared calm and was answering questions and had not changed any from their first contact earlier that day. Lovett reiterated the story, as testified to by Agent Brady, concerning the television, $5.00, etc. After this interview they returned to Chickasha around 7:00 p.m.

Upon returning to Chickasha, defendant was again advised of his rights (Miranda warnings) which defendant read and signed. Officer Turner then began taking down the statement furnished by defendant, which defendant had initialed on each

page and signed at the back. [See Appendix—Exhibit 36]. Lovett testified that this was completed around 11:02 p.m. and they went to Lawrence's Cafe to eat, where defendant appeared calm, and more relaxed. After eating, the defendant returned to the Sheriff's Office.

Lovett then testified that the next contact he had with the defendant was at 2:15 p. m. on February 13, 1973, at which time the defendant appeared to be upset or anxious and that a doctor was called to examine him. The doctor arrived at 3:20 p. m.; however, before the doctor arrived, defendant stated that he could show the officers where Edna Shaw's body was. When the doctor arrived he examined the defendant and prescribed valium, and defendant took two tablets at 3:40 p. m., and signed a waiver of his rights. Lovett stated that defendant's condition had definitely improved and he was able to control himself, had a clear voice, and gave direct responses to questions.

Lovett, Investigator Turner, Detective Wheeler and defendant proceeded by car, under the direction of defendant, to Highway 81 north to Minco, turned west on Highway 152 to Highway 37, where they turned toward Hinton, turned south on a county road and drove seven-tenths of a mile south to a creek area which was surrounded by timber when defendant stated, "This is where the body should be found" or "would be found." Lovett testified that from where they stopped he could see approximately 50 feet away a burned area in the shrubbery; he then proceeded until he could see a right arm, the head and chest cavity of a human being lying on a log with the arm stretched out. At 6:15 p. m. they left the area guarded and decided to process the scene the next morning.

On the way back to Chickasha, defendant took two more tablets of valium. Upon arrival in Chickasha, about 7:00 p. m., they ate dinner at George's Steakhouse. From there they proceeded to the Sheriff's Office where defendant again was advised of his rights and the Miranda warning, which he signed. The defendant appeared calm, able to communicate and responsive to the questions.

Lovett then testified that the defendant initialed and signed a statement at 10:30 p. b. [See Appendix—Exhibit 38].

On February 14, 1973, at 10:35 a. m., Lovett arrived at the scene of the body. From there he proceeded to Boggy Creek Bridge on State Highway 37, where he found the following items:

1. A Chickasha newspaper addressed to 1602½ South 17th Street;
2. A gabardine jacket;
3. A trunk mat;
4. An empty aluminum foil box;
5. A piece of aluminum foil;
6. A bloody rag;
7. A cord about one-quarter inch in diameter;
8. A piece of compressed board.

Lovett stated that the trunk mat had the same type checked pattern as the one in defendant's trunk. He further testified that he later obtained the television set from Bob Thompson in Oklahoma City, and releaased it to the Grady County Sheriff.

Dr. A. J. Chapman testified that he was the Chief Medical Examiner for the State of Oklahoma. On February 14, 1973, he visited a scene northwest of Minco, Oklahoma, because Mr. Tom Puckett, Chief Agent for the State Bureau of Investigation, notified him that a body had been found in this location. The doctor then described the body found at the scene. There were extensive contusions on the back part of the hand; the skin of the face and head was extensively burned; lacerations and multiple areas of contusions were present in the scalp area; hemorrhages were also associated with the fractures in the brain area. Dr. Chapman described these wounds as "defense wounds"—that is, wounds occurring to the body when a person is trying to ward off an attack. In his opinion, the person died

from traumatic head injuries caused by being beaten in the head a minimum of eight times with a blunt instrument, and was dead before her body was burned; and that the manner in which the injuries were inflicted was homicidal, not accidental.

Raymond Homer, an Identification Officer with the O.S.B.I., working with fingerprints, photography and class identification, testified that he assisted in the criminal investigation near Minco at the site where the victim was found. He also identified the objects found near Boggy Creek. Mr. Homer matched certain latent fingerprints of Mrs. Shaw found on a mayonnaise jar in her apartment, with the right thumb fingerprint taken from the victim.

Jerry Erwin, Sheriff of Canadian County, testified that he visited a scene in his county with officers from Grady County, and also searched the Boggy Creek area with the officers.

William J. Covey, a forensic chemist for the O.S.B.I. conducted tests on various items of evidence and determined that blood stains were present on certain items introduced into evidence, such as the eyeglasses.

Carl Cloud, technician for the O.S.B.I., testified that he was assigned to the firearms and photography section of the State Bureau. He was called to photograph the crime scene and identified certain photographs which he took at the scene and at Boggy Creek.

John McAuliff, Chief Chemist for the O.S.B.I., testified that his work involved the analysis and examination of all physical evidence through law enforcement agencies throughout Oklahoma. He then identified various exhibits under his control.

Robert Frank Byrd, on direct examination, testified that he was living in Chickasha in January of 1973 and was in a pawn shop in Chickasha on January 29, 1973, attempting to purchase a gun but could not because he had no driver's li-

cense. Defendant was also present at the pawn shop and followed Mr. Byrd outside, asking him what kind of gun he was interested in purchasing. Defendant offered to sell him a .38 police special, which he did not buy. This meeting was his last contact with defendant. On February 2, 1973, Mr. Byrd was in Mercy Hospital in Oklahoma City.

James Turner testified he worked for the Sixth District Attorney's Office of the State of Oklahoma, and was involved in the investigation of the disappearance of Mrs. Shaw when he first met the defendant. Mr. Turner gave defendant his basic rights under Miranda, and identified an exhibit with Fred's signature on the Miranda rights form, dated the 12th of February, 1973. Mr. Turner then took down a statement made in narrative form given by defendant as to the events on the night of February 2, 1973 [See Appendix—Exhibit 36]. He stated that defendant appeared calm and talked in a reasonable manner. Most of the statement was then read by Mr. Turner. Mr. Turner further testified that the defendant was again advised of his rights under Miranda before he took the officers to Mrs. Shaw's body. After defendant promised to show the officers Mrs. Shaw's body, he was again advised of his rights under Miranda. Upon finding the body, officers were left to guard it that night. Upon arriving at the Sheriff's Office, defendant was readvised of the same Miranda warning and he signed another waiver and then made another statement [See Appendix—Exhibit 38]. The next morning Mr. Turner returned to the area in which the body was found and searched for other physical evidence at the scene.

The exhibits were circulated among the members of the jury and the State then rested.

The defendant demurred to the State's evidence upon the grounds that the same is insufficient to support the charge of Murder.

The jury found the defendant guilty of Manslaughter in the First Degree, and fix-

ed his punishment at imprisonment in the State Penitentiary for thirty-five (35) years.

In defendant's first proposition, he argues that the statements attributable to defendant on the 12th and 13th days of February, 1973, are inadmissible for the reason that the Miranda waiver, as well as the statements themselves, were obtained under conditions inherently coercive in nature and in violation of defendant's constitutional rights. Defendant's contention is based on three allegations: (1) that defendant's arrest was illegal; (2) defendant was held incommunicado; and (3) that defendant's physical and mental condition rendered his statements involuntary.

As to defendant's first contention, we find that defendant's arrest was legal and based on sufficient probable cause. After carefully examining the facts and evidence, we find that the State had probable cause, and not mere suspicion, to arrest defendant on the charge of larceny of the deceased's television. The police and jail records reveal that the defendant was charged with larceny of the television on February 13, 1973. See 22 O.S.1971, § 186; 22 O.S.1971, § 190 and Henry v. State, Okl.Cr., 494 P.2d 661 (1972).

This Court has held that mere delay in arraignment of a prisoner will not render the statement or confession involuntary, nor inadmissible, if it is otherwise shown to be voluntary and given without coercion, fear produced by threats or mistreatment, or promises of such a nature that would induce defendant to relate an untruth.

The record clearly reveals that defendant was, on numerous occasions, given his Miranda rights, his right to remain silent, that anything he said could be used against him in a court of law, that he had the right to the presence of an attorney, and that if he could not afford an attorney, one would be appointed for him prior to questioning, if he so desired. Defendant was afforded the option to exercise his rights throughout the interrogation. Miranda v.

Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694, (1966).

This Court, in Castleberry v. State. Okl. Cr., 522 P.2d 257, 269 (1974), held:

". . . This Court will not disturb the trial court's ruling permitting the introduction of a confession if supported by sufficient evidence that the defendant knowingly and intelligently waived his rights and understood the consequences of said waiver. Warren v. State, Okl. Cr., 495 P.2d 837."

We find that the defendant consistently, knowingly and intelligently waived those rights and agreed to answer questions and make a statement, and that the trial court properly ruled on the legality of the arrest and voluntariness of subsequent statements.

The defendant also contends that he was held incommunicado without counsel. The Court finds that this contention is without merit, as the record reveals that the defendant consistently waived his right to counsel.

Defendant further contends, regarding the defendant's confession at OSBI Headquarters, that the officer failed to mention that the statement could be used as evidence in Court against him. The State submits that defendant had been repeatedly given his rights as stated in Miranda v. Arizona, supra, and that such verbatim repetition is generally held to be unnecessary. See Maguire v. United States, 396 F.2d 327 (9th Cir. 1968); Miller v. United States, 396 F.2d 492 (8th Cir. 1968); United States v. Mansfield, 381 F. 2d 961 (7th Cir. 1967); and Moreno v. State, Okl.Cr., 504 P.2d 1241 (1972).

It is defendant's further contention that his statement on the evening of February 13, 1973 [See Appendix—Exhibit 38], was inadmissible because of his emotional state. However, the record reveals, and as the trial court ruled in the Jackson-Denno hearing, that defendant's nervousness was precipitated by his own statement that he killed Mrs. Shaw or was responsible for her death, and not the other way

around. Agent Lovett testified that defendant was again advised of his rights (Miranda warnings) which he read and signed; that defendant appeared calm and had control of his faculties and gave direct responses to the questions and that defendant initialed each page and signed the statement on the back.

Defendant's third contention is that his statements were inadmissible because he was allegedly suffering from withdrawal of heroin and was under the influence of the drug valium when he made such statements. The Court cannot agree with this contention. There is no evidence presented by defendant which sufficiently shows that defendant's will was overborne. On the contrary, the record reveals that even defendant's expert witness at the Motion to Suppress was not sure what effect valium would have on a heroin addict nor the effect on heroin withdrawal, nor even defendant's tolerance to the drug. Furthermore, the trial court stated, in its ruling on the Jackson-Denno hearing:

" . . . The Court finds that the defendant was fully advised of his rights under Miranda prior to his Exhibit No. 36; that he fully understood those rights, and that he voluntarily and intelligently waived these rights prior to agreeing to show where this body was; that such statements were voluntarily and intelligently made, and the acts that he performed in accordance therewith were voluntarily and intelligently done; that none of them was given or done at a time when the defendant's will was overborne, and that each was the product of a rational intellect and a free will. In regard to these items, the Court specifically finds that there was no withdrawal from drugs affecting the defendant during this period sufficient to overbear the defendant's will. We have a number of doctors' statements. The doctor from the hospital at Norman indicated if he had been in withdrawal it would have shown up on the 15th when he was over there. The Court finds that the

valium prescribed by Dr. McDougal, taken by the defendant at this time, during this period, shortly before this time, did not sufficiently affect the defendant's mental processes to cause his will to be overborne or to prevent his subsequent statements, actions or omissions and acts from being the product of a rational intellect and free will. Now, that is in regard to Exhibit No. 36.

"Now, in regard to Exhibit No. 37 and No. 38. This involves another Miranda warning given at 7:50 on the night of February 13th. This is after the defendant had been up to the southwest corner of Canadian County; at about 6:20 on the way back he took two more valium tablets, and then they had stopped out at George's Steakhouse, at which time there the defendant had eaten a regular meal of ribs. After they finished eating out there, then they came down to the Sheriff's Office and that is when this No. 37 and No. 38 was done. Now, again, we have all the statements of the officers of the defendant's actions, we have the statements of the doctors who stated that if he had been under withdrawal it would have shown up on the 16th when they examined him on the morning of the 16th. There is no evidence that I could find of any withdrawal as such, other than certain statements made by the defendant himself. Dr. Harrison had examined him on the morning of the 13th out at the hospital and didn't see any evidence, any symptoms of it. He admitted that he didn't know what the symptoms were but when asked the specific symptoms that the other doctors had stated were symptoms, he said that he didn't notice any. So, in regard to the last two items, again, the Court finds to the Court's satisfaction that the defendant had been fully advised of his rights under Miranda, and Exhibit No. 37; that he fully understood his rights under Miranda; that he voluntarily and intelligently waived his rights prior to making the statement.

"In regard to Exhibit No. 38, it is the Court's conclusion that it was voluntarily and intelligently made; that it was not given at a time when defendant's will was overborne, and it was a product of a rational intellect and a free will.

"The Court specifically finds in regard to these two exhibits that there was no withdrawal from drugs affecting the defendant during this period that was sufficient to overbear defendant's will; that the valium prescribed by Dr. McDougal and taken by defendant during this period—now, this made a total of four of those tablets, two of them at 3:40 and two at 6:10—spaced during all this period of activity—did not sufficiently affect the defendant's mental processes to cause his will to be overborne or to prevent such statements and this waiver of his constitutional rights under Miranda being the acts and product of a rational intellect and a free will, the Court finds that they were voluntarily and intelligently made."

It has been held that the question of voluntariness of confessions or consent to search is a question of fact and that being under the influence of narcotics does not necessarily preclude giving voluntary consent to search. People v. Garcia, 227 Cal. App.2d 345, 38 Cal.Rptr. 670, (1964).

The Court in Ortiz v. United States, 318 F.2d 450 (9th Cir. 1963), stated that for a confession made while under the influence of a narcotic drug to be invalidated, the record must show that the defendant's ability to comprehend questions and his coherency be affected by the drug. From the record, it appears defendant was able to comprehend the questions and answered all questions coherently and in an intelligible manner. Therefore, this Court finds the defendant's proposition of error to be without merit.

■ The defendant's second proposition is that evidence derived as the result of an unreasonable search and seizure, or discovered by the use of an involuntary confes-sion, is inadmissible. The defendant contends that the search of defendant's apartment and automobile were invalid because of the reasons discussed in Proposition I. However, because the Court found that the defendant voluntarily, knowingly and intelligently waived his rights under Miranda v. Arizona, supra, the searches were valid. The trial court properly ruled on the matter when it stated:

"The Court finds this search—in other words you have got a consent to search here, which had been preceded by Miranda warning, and the Court finds that the appellant has been fully advised of his rights under Miranda prior to his consent to search, and that he had voluntarily and intelligently waived those rights, and that he voluntarily and intelligently executed a valid consent to search. Taking into consideration all of the evidence the Court is satisfied with that."

■ Where there is any evidence upon which a verdict can be based, the verdict will not be disturbed on appeal. See Glover v. State, Okl.Cr., 524 P.2d 51 (1974). The court considered the statements from doctors concerning withdrawal effect which might affect the voluntariness of defendant's waiver of his rights, and the court found his waiver to be voluntary. Such statements would be sufficient evidence to support the verdict; therefore, the contention of defendant is without merit.

The defendant's third proposition alleges that the State did not sufficiently prove the corpus delicti. Corpus delicti is defined in Wharton's Criminal Evidence, Thirteenth Edition, Section 691 as follows:

"The corpus delicti, meaning the body or substance of the crime charged, involves two elements: (1) An injury which is penally proscribed—e. g., in an unlawful homicide, a person killed; in larceny, certain property missing; and (2) the unlawfulness of some person's conduct in causing that injury. Proof that the defendant was the person who engaged in

the unlawful conduct is of course necessary for a conviction, but it is not an element of the corpus delicti. . . ."

■■ It is also a well-settled rule that the corpus delicti may be established by direct or circumstantial evidence, or both. Pumpkin v. State, Okl.Cr., 295 P.2d 819 (1956). In Pumpkin v. State, supra, it was also held that the order of proof is generally within the discretion of the trial court and if error is committed in admitting testimony of guilt before the corpus delicti is established, the error is cured when the subsequent testimony sufficiently establishes the corpus delicti. The Court held in Pumpkin v. State, supra, at 823:

"Direct and positive proof is not essential to establish the corpus delicti, and it may be proved by circumstantial evidence. When it is proved by circumstantial evidence, the question should be submitted to the jury along with other questions of fact in the case, as to whether or not the state has established the corpus delicti beyond a reasonable doubt."

See also Ridinger v. State, Okl.Cr., 267 P. 2d 175 (1953) and Osborn v. State, 86 Okl.Cr. 259, 194 P.2d 176 (1948).

Defendant cites Bonicelli v. State, Okl. Cr., 339 P.2d 1063 (1959), in support of reversing his conviction. However, the *Bonicelli* case can be distinguished in that in that case there was no evidence other than the defendant's confession that he had committed the burglary. In the instant case there is independent evidence, and not solely that of defendant's confession, establishing the crime which had been committed. At trial, the State showed that the deceased, Edna Shaw, was missing; her glasses were found near pools of blood in her apartment and down the back steps; neighbors heard loud voices and the sound of something being dragged; Mrs. Shaw's boarder discovered the deceased and her TV missing; the deceased called her sister and in a whispering voice told her to call back in five minutes; the front door was padlocked from the outside; there was no sign of forcible entry; the defendant was a friend of the deceased; the defendant was seen with the deceased's television; and defendant told friends that it was stolen; there were blood stains found in the defendant's car and on shirts and a pair of shoes found in his apartment. Taking into consideration all of the above and evidence adduced at trial, we hold that the corpus delicti was shown independently of defendant's statement.

■ Defendant's last proposition asserts that the sentence was excessive and was shown to be a product of the photograph of the deceased's body. Defendant contends that the sentence was so excessive as to suggest that the same was given under passion and prejudice, influenced by a gruesome and gory photograph of the deceased. The defendant failed to explicitly explain the nature of the photograph or the effect of it on the jury.

In Abel v. State, Okl.Cr., 507 P.2d 569, 572 (1973), this Court said:

"The second proposition contends that the court erred in admitting the photographs of the deceased into evidence. The defendant argues that the photographs were inflammatory and prejudicial and that no proper foundation was laid for their admission into evidence. We are of the opinion that the photographs were properly admitted. In Pate v. State, Okl.Cr., 361 P.2d 1086, we stated in the eighth and ninth paragraphs of the Syllabus:

'When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things, or places.

'Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arrouse [sic] the passion of the jury, such photographs are admissible; when they are relevant to the issues before the court and their probative

value is not outweighed by the danger of prejudice to the defendant.' "

Further, in Vavra v. State, Okl.Cr., 509 P.2d 1379 (1973), this Court held that the admissibility of a photograph into evidence in a criminal case was a matter left to the discretion of the trial court under the circumstances of a particular case. See also McNutt v. State, Okl.Cr., 288 P.2d 418 (1955); Arnold v. State, Okl.Cr., 291 P.2d 1044 (1955); and Snake v. State, Okl.Cr., 453 P.2d 287 (1969).

The Court finds that no abuse of judicial discretion is reflected in the record. The photograph in question was identified by several witnesses as being the true and correct pictorial representation of the body of the deceased Edna Shaw when discovered by the police. We are of the opinion that the facts in this case show that the probative value of this photograph outweighed the prejudicial effect and was, therefore, admissible in evidence.

■ As to defendant's contention that the sentence is excessive, we reiterate our holding in Roberts v. State, Okl.Cr., 473 P.2d 264 (1970), wherein we stated, in the second paragraph of the Syllabus:

"The question of excessiveness of punishment must be determined by a study of all the facts and circumstances in each particular case, and the Court of Criminal Appeals does not have the power to modify a sentence unless we can conscientiously say that under all facts and circumstances the sentence is so excessive as to shock the conscience of the court."

See also Futerll v. State, Okl.Cr., 501 P.2d 901 (1972).

■ An examination of the record does not reveal the sentence is a result of passion or prejudice and this Court has consistently held that a sentence will not be disturbed on appeal if it is within the statutory limits. See Fields v. State, Okl.Cr., 501 P.2d 1390 (1972) and Callaway v. State, Okl.Cr., 518 P.2d 1277 (1974). For this reason, we find that in light of the evidence of defendant's guilt, and the fact that the record reveals that the defendant was charged with Murder and the jury sentenced him to 35 years for Manslaughter in the First Degree, the punishment assessed by the jury was not excessive. We, therefore, find this proposition of error to be without merit.

For all of the above and foregoing reasons, the judgment and sentence appealed from is accordingly affirmed.

BLISS, P. J., concurs.

BRETT, J., concurs in results.

APPENDIX

EXHIBIT 36 *

George Edward·Fred w/m 2–4–53
1602 South 17th 222–0384
Re: Edna Shaw

J. Turner, E. Lovett, B. Snell, D. Wheeler, 7:25 A.M. – 2–12–73

I have lived here in Chickasha, Okla. since Oct. 8, 1972. I lived in Welborn Hotel, room # 7. I stayed until Nov. 26, 71. Then I moved to an apt. 1209 Colo. on the North side. I stayed there from Nov. 26 til Jan. 17, 73. I first met Mrs. Edna Shaw when I first moved in. I didn't see her much while there. I was busy painting the apartment and plastering and putting up curtain. She lived in the South apartment.

I visited in her apartment three or four times. She came over to see about me a few times. I ate with her and James Lewis once in her

---

* The name "G. E. Fred" and all initials, omitted.

apartment. She had a color T. V. brown in color with screw on legs. Big screen 23" screen, I think.

She once kinda ask me if I was interested in her sexually. She said "when is the last time you had a little." She drank quite a lot. I took her to a liquor store; Georges on Choctaw. She bought Sunny Brook bourbon and Smirnoff Vodka. She got a govt. check. I don't know when she got it. I took her to Safeway to cash it once. She had a lot of drinking buddies.

I worked for H. & P. Drilling Co. out of Tulsa on Rig 53. I later got a job with E. W. Moran out of Wichita Falls, Tex. We worked west of Marlow during the ice and snow. I went to work last Tuesday 2–6–73 for Lawrence Machine Shop as a welder and trimmer.

Jan. 29, 73 I was at 81 Pawn Shop to pawn a radio. While I was there a colored man in his early 20's 5'11", approx 160, semi Afro hair, thin moustache first name Andy came in. He was trying to buy a 38 pistol. The lady ask him after she showed him a gun if he had an Okla. Drivers License. He said he didn't and she wouldn't sell him the gun. This was approx. 3 P.M.

He started walking out and I happened think of Rod Rinn having a .38 pistol that I had borrowed. I told Andy I knew of a 38 special. I told him the price would be $40.00. I had the 38 at my house at the time. He said he wanted to talk to me about it.

I gave him a ride down to in front of the Chickasha hotel. He said he was from New Iberia, La. He said he wasn't working but that he was just living off what he stole. He said he stole cars, motorcycle, guns, stereo's, even dope.

We made arrangements to meet at the corner beside the hotel at 7:30 P.M. across the street from the Bus Station. I told him to have the $40.00.

I met him at approx. 7:30 P.M. I drove my car, a 67 Dodge Coronet, 2 Dr. Hardtop, XV6569, 73 Okla. tag.

Andy got in the car with me when I drove up. We drove across the street. I took the gun out from underneath the seat when we parked. I showed it to him and he looked at it and was well pleased with it. He talked me into letting him have it for $20.00 down. I took the $20.00 and he put the gun in his belt. I ask him if he wanted a lift anyplace. He wanted to go to the 100 block of Oregon. He got out there. I don't know what house he was supposed to live in there. The last he said was he would pay me the rest of the money.

The next time I saw him was Thursday night 2–1–73 about 8 P.M. He was walking across the street from the Bus Station toward the Chickasha hotel restaurant. I ask him about the $20.00. He said he didn't have the money. He said hadn't been able to rip off anything or sell anything. He & I went back to the car and I gave him back the $20.00 and he gave me back the gun.

While we were sitting in the car talking he ask me if I knew anything he could steal and I happened to think of Edna Shaw and her having a color T. V.

I told him I knew a lady I used to live next door to who had a color T. V. that would be pretty easy to get. His eyes brightened up and he seemed interested.

I agreed to take him by the next night. I was to meet him the next night Friday 2–2–73 at the same place. He agreed to go in and get the T. V. and I was to take the T. V. to Okla. City and sell it.

I told him the old lady was old and lived alone. I didn't tell him the address nor how to get into the house at that time. He got out of the car and walked off. I drove out to the Stork Club and stayed until one or two o'clock, and then went home.

Friday 2–2–73, I spent part of the day trying to get a job. I tried the Research Center, then Stidhams Horse Trailers, Love Horse Trailers, Circle H Horse Trailers. I just spent most of the day trying to get a job.

About 5:30 or 6 P.M. I went home and cleaned up. I dressed nice. I can't remember for sure what clothes but I think I wore brown socks and flowered colored shirt. I wore my green colored Marine cap. I went to the Green Parrot Club. I got there between 7 and 7:30 P.M. I had a few beers and lost about $15.00 shooting pool. Some college kid with some girls beat me (2 or 3 girls). The girls cheered when I flubbed a shot. He is about 22, 5′5″, 150 lb., short brown hair. I left about five minutes til 9 P.M. I left my cap in the bar. I never went back and got it. Louise was the bar maid. A girl by the name of Marylyn with red hair was there. Marylyn tried to get me to go out to the Stork Club with her.

When I left the bar I drove to the Chickasha hotel. Andy was there waiting for me. He got in and we went down Choctaw down to 12th and turned South and went to Colo. I showed him 1209 Colorado.

We had already agreed that he would take my car. He didn't have a car. I told to knock on the back door. I told him to try the door and if it was unlocked to go on in and if it was locked to knock on the door and if the old lady answered to tell her it was Freddie. I showed him where the alley was. I told him to leave his lights off til he got on 12th Street so they won't see my tag. I told him she was an alcoholic and would probably be drunk. I didn't expect for him to have any trouble at all. I told him not to let her see his face. I didn't go at all because if she saw me she would recognize me.

He let me out on the corner of Iowa and 12th Street. Across the street from the Grocery Store. He let me out a few minutes after 9:10 P.M. He made a right on Minnesota, he must of made a complete block on 13th Street.

I smoked a couple of cigarettes. He was out of there by 9:35 or 9:40 P.M. I was looking at my watch every minute. No cars came by or no one walked by that I saw.

The next I saw of him he was coming out of the alley behind 1209 Colo. He made a real sharp turn out 12th Street and he pulled up to where I was.

The right side door wasn't completely closed. The legs on the T. V. wouldn't let it shut. I opened the door on the right side. I pried the T. V. up and got into the back seat.

He took a right on Minnesota going west. I ask him "How did it go Andy?" and he said "what do you think?" and he patted the T. V. I ask "did you have any trouble? Did anybody see you?" He said "aw now except that old man, he caught me and I hit him over the head." I ask him "did you kill him?" and he said "aw I just knocked him out."

We went back to my house and he parked it on the North side where I allways park. He was still shakey; trembling. We both went into my house. We opened a can of beer. He said "are you going to get rid of that tonight?" I said "I guess so."

I was broke but I didn't try to get any money from him. I wasn't in the house over 10 minutes. The left side of his shirt was stained. He had on a pale orange colored shirt (it might of been green; it was light colored), and blue jeans and a blue jean jacket. Oh yes he had on a pair of brown buckle slip-on shoes of mine; size 10 that he had put on in the car. He had seen them in my car before we got to the house (Edna Shaws) and he had ask me if I cared if he wore them.

I told him he could wear them. I didn't notice any blood on them at the time we were at the house. I noticed blood on them today.

I left him there at my house. I left at 15 til 10 P.M. I went to Rod Rinns house to borrow some money. I knocked on the door and went in. He and his wife were there. There was some other couple there. Bob and Carrol I think. He introduced them to me. When I got inside he ask me if I wanted a beer. He opened me one. I ask him if I could talk to him in the bedroom. He and I went into the bedroom. I told him I had just stolen a color T. V. He ask me for a little bit more detail. I just told him I was involved in it. I had to get rid of the T. V. I told him the guy that done it had said he had got caught by an old man and he had had to knock him out.

I ask him if he would help me move the T. V. from the front to the back seat. I said that way your fingerprints would be on it. I said this in front of his wife and his company.

He put a shirt on came out side and we unscrewed two legs off the T. V. and put the T. V. in the back seat of my car. He gave me the $5.00 and I got into my car and I drove East on hiway 62 and I got two dollars worth of gas at the Champlin service station just before you get on the Turnpike. I also got change for a dollar and I got a coke and took it with me. I guess I was at the station until approx. 9:55 P.M. I'm not sure about the coke.

I got on the Turnpike and went North to Okla. City. I drove to Southwestern Ave. and got off the Turnpike. I went North up Western to the second service station North of the Turnpike. A Kerr McGee Ser. Station. I called Mike Johnson at either 632–6037 or 632–6107. I got the phone number from a man named Phillip that I met at the Pub here in Chickasha. He, Phillip had told me that if I ever needed to get rid of anything this Mike Johnson could get rid of it for me. Phillip is w/m under 21, 5'10", 170 lb., red kinky hair and beard and green eyes. He used to work for the city, in the Water Dept. This was in Dec. He uses drugs. He has gone to Houston because of drugs. He has been back one time since he went to Houston. He drives a small green foreign made car, a 70 or 71 model.

After I called Mike Johnson it was 5 or 10 minutes before he got there. He is w/m 25 or 26, 5'7", 190 lb. brown hair short. He was driving a dark blue late model (70 or 71) fast back Mustang. I had told him I had a color T. V. console Delux. I believe the T. V. was an R.C.A. He had ask me if it worked. I told him yeah.

He ask me if it worked when he looked at it. I told him I had just stolen it. I ask him a hundred dollars for it. He offered me fifty and I took it. Fifty dollars is better than nothing.

He pulled his car in and backed it up beside of my car and I helped him put it into the trunk of his car.

He reached into his wallet and gave me two $20.00 and one $10.00. I took the money and put in my pocket. He went South on Western. I went into the Service Station and I got change for the $10.00 and I got a pack of cigarettes. I'm not sure what time I was at the service station but I was back at my house at 11:30 P.M. I came back the same route I went.

Andy was still at my house when I got back. The kitchen light was on and he was watching T. V. when I got back. He ask me "How did it go?" I told him "allright I only got $50.00 for it." He said "Shit do you know how much that cost?" I told him $50.00 is better than nothing." So I gave him $25.00. I gave him a twenty and a five.

He still had on the same shirt and pants. I don't know if he had on shoes. He ask me if I had a gas can. I went and got him one. He ask if he could borrow my car. I ask him "Did you run out of gas?" and he said "I'll get it, I'll get it." He left about 11:45 P.M. in my car. He said he wouldn't be long. He took the gas can with white letters. I don't remember what the white letters said. Maybe Ovaline.

I had approx. ½ a tank of gas in my car when I got back from the city. There was no gas in the can that I gave Andy.

Andy got into my car and left about 11:45 or 11:50 P.M. He said he wouldn't be long. He said he would be right back. I sat down and watched T. V. for awhile. I was worried he wouldn't bring my car back. I finally went to bed about 1:30 A.M. 2-3-73. I didn't go to sleep right away.

When I got up the next morning at about 6:45 A.M. 2-3-73 my car was parked where I allways parked on the North side of my house on Virginia Street. I went out and looked at the car. It had mud on the fender on the windshield on the sides of the tires. It was red colichic mud. There was grass and mud underneath the car. There was mud in the floor board on the gas pedal. There was no mud on Passenger side or in the rear seat. There was no blood on the floor board of the car. There was blood on the rear bumper of the car on the right side and there was blood below the bumper on the right side.

I don't know if the blood was on the car when he took it at 11:45 P.M. 2-2-73 but the mud was not on the car at that time. I took my car to the car wash. I noticed it only had about ⅛ of a tank of gas at that time. Knowing the car like I do I would judge he had driven at least a hundred miles or more from the time I loaned him the car until he brought it back and parked it.

I took the car to the car wash across the street from the A & W on 4th Street. I begin washing it off. There was a guy in a redish colored pickup pulled up beside me when I was washing it. (Trunk)

When I was washing the car off I noticed there was blood in the trunk. There was blood on the spare tire, there was blood beneath the rear deck lid, there was blood on the left side of the trunk. There was blood or spots of blood on the rear lights inside. The blood was on the 15″ spare tire. I have two spare tires. My snow chains were missing. My Jack handle was missing. The gasoline can was not there. The trunk mat was missing. The rubber stoppers (gourmet) that go into the holes in the bottom of the trunk were missing. The back of the car looked like somebody had dumped a bucket of water in it and had rubbed it with their hand. It looked like a feeble attempt to wash it out in the dark. I went ahead and washed the turtle back out. I put on my new tag. I had bought the tag Jan. 16, 73 but I hadn't changed the tag until then. I changed it so that if anyone had got my tag number. I still have the old tag at home.

I'm sure all the items were in the car before I loaned it to Andy. My car was not as dirty before I loaned it to him. I have had the car since Jan. 16. I bought it from Mel Ashley in Okla. City. He is at 1021 S/W 52nd Street, Okla. City. There was no blood in or around the car before 2–2–73.

I didn't wash underneath my car. There was and still is mud all underneath it.

I actually put the new tag on my car at home. I didn't have a screwdriver with me at the car wash.

I left the car wash and went back home. Andy's Tennis shoes that were stuck under the front seat passenger side I took into my house. I put them in my bedroom where they are now. I saw the shoes I had loaned him in the hall between the kitchen and the living room. I put them in the bedroom closet.

I cleaned up the house. Later about 10 A.M. I went over to Kenneth Hurst house and I visited Kenneth & his wife. I loaned Gary Henry a speaker out of my car. They mentioned that my car was real nice and clean. That was the first time I had washed my car since I owned it. I begin getting the feeling there that I was being watched about then. Gary Henry and Brenda Henry were there. They decided to go over to Gary's house and listen to a new album. I decided not to go so I went back home. I later went to Steve Hinton house and stayed a while and later I came home and stayed all night. I hardly slept any.

The next day Rod Rimm called me and told me Edna Shaw was missing. He said some of relation worked in county clerks office and he had learned that a woman was missing. That they had found blood in the kitchen and in the driveway. He ask me if I was in on it. He ask me clear if I done it. I said no.

I got pretty shook-up then. I was in a spot. I ask myself "what should I do, should I wait for them to come and interrogate me? Should I go down to the Police station and confess. I actually ask Rod if I should go to the Police Station and tell them what I know. He said they will be in touch with you.

I kinda waited around kinda hoping you all would come. The Police contacted me about 10 A.M. today. They treated me fairly and courteous at all times. They put it to me in a more polite manner than I expected. The Police have never threatened nor mistreated me in anyway. They have been very considerate. They have not promised me anything in return for making this statement. Before I made this statement I was advised of my right by Ernest Lovett, Frank Brady, Danny Wheeler and James Turner. I fully understand and understood what my rights were. I also signed waiver of my rights. I signed a waiver of search of my house and of my car.

I have read the above statement containing 14 handwritten pages. It is true and correct to the best of my memory and knowledge. I have given this Statement of my own free will without any persuasion or coersion. I have initialed each page and I will sign it as being the sworn truth to the best of my knowledge.

/s/ George E. Fred
2–12–73
11:02 P.M.

Statement read by George E. Fred and signed 11:02 P.M. 2–12–73.

/s/ James Turner
/s/ Ernest L. Lovett, OSBI
/s/ Danny L. Wheeler Detective Chickasha P. D.
/s/ Bob Sneed Chickasha Police Dept.

APPENDIX

EXHIBIT 38 *

George Edward Fred
1602 South 17th Chickasha 222–0384
Re: Edna Shaw

J. Turner E. Lovett, D. Wheeler. 7:53 P.M. 2–13–73 at S. O. Chickasha.
 /s/ G. E. Fred

I have just returned to the Grady county jail. I have been with Ernest Lovett, Danny Wheeler and James Turner to a point approx. ½ mile south of hiway 37 on a dirt road. I showed the officers the remains of Edna Shaw.

I knew where she was because last Feb. 2, 1973 a negro man by the name of Andy Sites and I hauled her and I saw Andy drag her body out of the back of my 67 white 2 Dr. H. T. Dodge Coronet. He drug her from the Trunk of the car to a point about 50 feet West of the dirt road. He came back to the car and got a Tin can; a Five gallon can of gasoline. The Gasoline was in the front seat of the car. He got a lug wrench out of the front seat. He took the Gas can and the lug wrench to where he had drug the body of Mrs. Shaw. I didn't see him pour gasoline on her but I saw the flames when he lit the fire.

I first met Andy at 81 Pawn Shop on South 4th Street here in Chickasha. I later made a deal with him to sell him a 38 Special I had borrowed from Rod Rinn. I met him Jan. 29, 1973.

* The name "G. E. Fred" and all initials, omitted.

I met Andy Sites again on Feb. the 1st 73. At this time he and I made plans to steal a T. V. from Edna Shaw who lived at 1209 Colo. here in Chickasha. I knew she had the Color T. V. because I had formerly lived at the same address in the North apartment. She lived in the South apartment. I have visited with her in the apartment. I had seen the Color T. V. then.

I didn't tell him where Mrs. Shaw lived on the First of Feb. 73. I met him about 9 P.M. Feb. 2nd 73 at the Corner near the Chickasha hotel. I had been at the Green Parrott from about 7 P.M. to near 9 P.M. I had lost $15.00 playing Pool there. I also left my dark green marine cap there that night. I picked Andy up in my car. We drove up to near Edna Shaws house.

I told him "This shouldn't be too hard. She knows me." I was to go in and take her into the bedroom and entertain her. He was to stay hid until I got in and he was to slip in and get the T. V. I was to leave the back door open for him.

I drove down Choctaw turned south down 12th across Chickasha and Kansas Ave into Colorado. I pulled into 1209 driveway which is on the East Side of the house. I pulled up near the rear (South) door of Mrs. Shaws apartment. The rear of my car was about even with back door of her hourse. About four or five steps from the back steps. Andy layed down in the front seat of the car. I got out and left the keys in the ignition. I went to the South door.

I knocked on the front door. It was locked. She came to the door and motioned for me to come around to the back. She came to the back door and let me in. The front door had a padlock on it.

She said "long time no see." I said "yeah" she said "where you been?" I think. She said "how you been?" I said "o. k." She ask me if I had been working. She told me James Lewis was gone to cash a check and would be back about 9:30. This was about 10 or 12 minutes after 9 P.M. I knew I just had a very few minutes. before James was back. You see I knew James stayed there, that was part of the plan. He knew me and if he came in and I was there he wouldn't think nothing of it.

She told me "The puppies you gave me, I gave to the pound." I said "That was nice."

There was some cold beans in a pan on the kitchen table. There was some plates that were dirty on the table like her and James had just eaten. There was a pint bottle of Sunny Brook whiskey on the table it had about 2 or 2½ inches of whiskey in it.

I had to go to the bathroom. When I came out she was in the bedroom. She had the whiskey bottle in her hand. I said Edna "how long has it been since you got a little?" I ask her this because she had kinda propersitioned me once. She said "been quite a while; not lately." She said "how about you? Have you got married?" I said "Naw" she said "well you haven't had any a long time either." I said "yeah, its been quite awhile."

She sat down on the bed beside me. I had sat down while we were talking. She still had the Sunny Brook in her hand. I put my arm around her. I ask her something about "how you been feeling?" she snuggled up almost on my lap.

About this time I heard this noise in the kitchen. Edna ran out through the Bedroom door with the Pint still in her hand. She ran through the living room. The lights were on in the bedroom and the living room. There were no lights on in the kitchen. She ran into the kitchen. I heard 3 or 4 quick thuds. Then I heard a thud like somebody was falling down or something.

I walked into the kitchen. I turned on the light on. She was laying in the floor her head was pointed south toward and behind the door. The door was about ¾ open. Her feet were laying by the refrigerator. The Front legs of the T. V. were out the door and the screen was partly open. The rest of the T. V. was still inside the kitchen. Andy was just to the right of the T. V. this would have been on the West side of the T. V. The Face of the T. V. was to the West. The jack handle lug wrench was laying on the table. He must have got it out of the turtle back of the car after I got out because it had been in the turtle back. I knew it was my lug wrench because I had used it before.

I heard her gurgling. Blood was coming out her mouth and her nose. I tried to help him get the T. V. out. I pushed the door into her body, pushing her out of the way so we could get the door open and get the T. V. on out.

Her glasses were laying beside her head. She was laying on her right side kinda. The glasses were laying kinda in front of her face. We got the T. V. out and tried to put into the back seat but I ripped a hole in the back with the legs.

We put it into the front seat as best we could and the right front door wouldn't shut. I ran around the car and got into the car and turned the ignition on. This is when I missed Andy. He was draging her by her feet down the front steps. Her hair was leaving bloody streaks on the steps. He was having a lot of trouble loading her. She was so was so limber she was slipping down out of his grasp. I grabbed her feet and we both shoved her into the turtle back of the car.

I got into the car and started to take off again and I went to looking for Andy. I saw him coming out the Kitchen door with the lug wrench. He got in from the Passenger side of the car—he shoved the T. V. forward and crawled in.

Andy must of turned the Kitchen light off. He didn't even shut the inside door (wooden door). I drove to the alley with my lights off. I turned left (East) toward 12th Street. There was an old Chevy Pick-up parked in the alley. I scraped the right side of my car on the pick-up getting past. I didn't turn on my lights until I got onto 12th Street.

Andy and I talked about what he had done for a color T. V. He said "It's Done, you helped me put her in the trunk didn't you?" I didn't answer him cause I did.

I drove to my house. We both got out and went into my house. I Parked on the North side on Virginia Street. I didn't have any blood on me so I kept on what I had on. He had on a pair of shoes of my. He said are you going to get rid of that tonight. I said yeah I'll get rid of it.

Andy had blood on his shirt and streaks of blood on his pants. I later saw blood on the floor of my house.

I left my house and drove to Rod Rinn and borrowed five dollars. I told him I had a stolen T. V. He helped me move it from the front to the back seat. We unscrewed the legs to get it into the back seat.

I drove to Okla. City. I went to Mel Ashley's house at 1021 S. W. 52nd Street. I tried to sell him the T. V. I told him it was ripped off about an hour ago. He said he didn't want nothing to do with it if it was hot. I told him I had had some trouble. Andy had to hit somebody on the head. I told him somebody else was with me. He would not let me even leave the T. V. there.

I left his house and stopped at a service station on Southwestern. I had called Mike Johnson from Mel's house. I was at the service station 5 or 7 minutes after I got there. It was a Kerr McGee Service Station. He pulled up in a 70 or 71 Fastback Mustang; Dark blue in color (73 tag). He ask me if I was Freddie. I told him I was and that I knew Phillip. (The guy who told me about Mike buying hot stuff). He looked at the T. V. and ask me if it worked. I told him "yeah it is just been ripped off." He ask me how much I wanted for it and I told him a hundred bucks and he said he would give me fifty.

I didn't want to take a stolen T. V. back to Chickasha so I sold it to him for fifty bucks. He paid me with two twenties and a ten. I drove to the next ser. station South of there and got change for the $10.00 bill. I got a package of cigarettes and a coke. The attendant was busy and I had to wait about 10 minutes.

I left and came back to Chickasha on the Turnpike like I went up. 1 got back home about 11:40 or 11:45 P.M. Andy was still there at my house watching T. V. He still had on my shoes. His Tennis shoes were still in my car.

I gave him $25.00, he said "Damn do you know how much one of those cost new" and I said well don't you know how we got it. He said we have got to do something with what we have got in the Trunk. He ask me if I had a gas can. I had a big 5 gal. can that was painted blue and had white lettering on it. It said "Ovaline" on it. I got the can. We put it in the front seat of the car and left. I drove to the gas station, Tally Wag 71 (12:00 A.M.) on 8th and Choctaw. I got out and went inside and gave the lady a $1.00 for Ethyl gasoline. I went back to the Pump and ran a dollars worth of gas in the 5 gal. can. Put the can in the front seat beside Andy and the lug wrench. I drove West on hiway 81 over the overpass and turned North on 81 up by Minco. I turned West on 152 and back North on hiway 37. I turned off hiway 37 like I told you before on the dirt road and drove down into a low place near some trees.

Andy had wanted to go to Anadarko because he knew a real good place to get rid of the body. I told him I wanted to go up the other side of Minco because I had worked on a rig up there. I saw the sign to rig 53 this afternoon; that was the rig I used to work on.

When we got to the spot I showed you this afternoon he said stop. I did. He said turn your head lights where I can see in there. He pointed West. He said turn on your bright lights. I did. He got out, he got the car keys and he lifted up the turtle deck. He dragged her body over into the brush. He came back and got the gas can and the lug wrench. I didn't see him lay her on the stump. He told me later he did. I saw

the flames. I couldn't see even in the flames. I couldn't see him for the bushes. He must of poured the whole dollars worth of gasoline on her.

He came back without the gas can or the lug wrench. He drove back to Chickasha. I was too shocked to even talk. He stopped by a bridge; the 1st or 2nd bridge after we got back on hiway 37. He threw away some rags the trunk floor mat and an old piece of newspaper. Maybe the coat he was wearing. This was approx. 2:30 P.M. I drove from there on in. Went back to my house. We both drank a can of beer. He ask me if I would give him a ride and I took him back to the Chickasha hotel. He said he had to talk to Lou Boudreau. I dropped him off at the hotel about 3 A.M. on 2-3-73 (Sat. morning). That's the last time I saw Andy. I went home. I cleaned the car out and washed it the next morning.

Yesterday 2-12-73 at 7:25 P.M. I gave a statement to you. Some of the things I said in it are not true. This statement is correct. I have attempted to clear up certain things such as I was in the house with Andy. I did help to steal the T. V. and I did help load Edna Shaw into my car and hauled her to where Andy unloaded her and set her body on fire. I made this statement of my own free will. I have at no time been mistreated nor pressured in anyway. I knew I could have a lawyer anytime I ask for one. I have not been promised anything in return for making this statement. I have been repeatedly advised of my rights and have signed Waivers of my rights before making this statement. I have read the hand-written pages of this statement.

/s/ George Fred 10:35 P.M.
Feb. 13 – 73